589 A.2d 217

**COMMONWEALTH of Pennsylvania**

**v.**

**Joseph Patrick PURCELL, Appellant.**

Superior Court of Pennsylvania.

Argued March 27, 1990.

Filed Feb. 21, 1991.

Reargument Denied April 30, 1991.

Richard J. Tompkins, Norristown, for appellant.

Mary A. Killinger, Asst. Dist. Atty., Norristown, for Com., appellee.

## ORDER

PER CURIAM.

Because a majority of the Court is in agreement that the record discloses no present need to award a new trial but that there is arguable merit in appellant's contention that trial counsel rendered constitutionally ineffective assist-

ance, IT IS ORDERED that the judgment of sentence be and it is hereby vacated, at least for the time being, and the case is remanded for an evidentiary hearing on appellant's claims of ineffective assistance of counsel. If counsel is found to have been ineffective and appellant was prejudiced thereby, a new trial must be granted. If counsel is determined to have acted reasonably, however, or, if appellant was not prejudiced by counsel's conduct, sentence may be reimposed. In the meantime, jurisdiction is not retained.

Before WIEAND, BECK and POPOVICH, JJ.

WIEAND, Judge:

Joseph Patrick Purcell was tried by jury and was found guilty of indecent assault and corruption of a minor.[1] Post-trial motions were denied, and Purcell was sentenced to serve a term of imprisonment for not less than eleven and one-half (11½) months nor more than twenty-three (23) months on his conviction for corrupting a minor. Sentence was suspended on his conviction for indecent assault. On direct appeal, Purcell asserts that (1) the verdict was contrary to the weight of the evidence; (2) the trial court erred when it removed explicit sexual material from love letters written by the victim; (3) the trial court improperly injected itself into the case; (4) the prosecuting attorney was guilty of prosecutorial misconduct by inappropriate remarks made during closing argument; and (5) defense counsel was constitutionally ineffective in the following respects: (a) for failing to object to the improper admission into evidence of testimony by a clinical social worker who discussed the general dynamics of child sexual abuse; and (b) for failing to request that the jury be instructed regarding the applicable statute of limitations. We will discuss these issues seriatim.

On May 19, 1986, appellant's seventeen year old daughter, Barbara Ann Purcell, reported to a high school teacher

1. The trial court sustained a defense demurrer to a charge of statutory rape, and the jury found Purcell not guilty of rape, incest and involuntary deviate sexual intercourse.

that her father had been sexually abusing her for several years. On June 30, 1986, following an investigation by the Montgomery County Office of Children and Youth Services and the Horsham Township Police Department, a criminal complaint was filed against appellant alleging that, during the period between January 1, 1979 and May 17, 1986, he had forced his daughter to engage in a continuing course of sexual activity with him.

■ The evidence at appellant's trial, for both the Commonwealth and the defense, was summarized in the trial court's post-trial opinion in the following manner:

At trial, Barbara Purcell, the eighteen (18) year-old daughter of the defendant recalled that the first incident of sexual abuse committed upon her by her father [had] occurred when she was approximately eleven (11) years of age. This incident consisted of her father fondling her breasts during her bath. As the years progressed, the forms and severity of abuse increased until by age thirteen (13) or fourteen (14) she was forced to engage in her first act of sexual intercourse with the defendant.

These incidents were continuous and frequent. They would occur

"whenever [the defendant] had the opportunity.... [when] my mother wasn't home, or if she was sleeping, and my brother was sleeping, he would either come in my room and do this to me in my room, or he would make me go downstairs."

. . . .

Sometimes it would happen three (3) or four (4) times in a week, then it lessened; on other occasions, it was more frequent.

The last incident of sexual abuse occurred Saturday, May 17, 1986. She had been to her high school prom the evening before with her cousin, John Purcell. At eight o'clock the following morning, the defendant entered her bedroom, where she was now nude from the waist down. Mr. Purcell began touching her body, he placed his fingers in her vagina, and then proceeded to have sexual

intercourse with her. It was after this incident that Barbara decided to report the defendant's conduct to a person in authority. On Monday morning, she informed her high school teacher, Mr. Barsky, about her father's conduct. Mr. Barsky's testimony confirmed both the conversation and the upset she displayed during this disclosure.

Barbara testified that she had not reported this conduct previously because she was embarrassed by the sexual acts perpetrated upon her by the defendant, she feared her father's violent temper, and knew the disclosure would deeply hurt her mother. Thus she hid her fear and torment for years with the exception of a single confidence. When she was thirteen (13) or fourteen (14) years of age, the victim told her girlfriend, Michelle Keller, that her father would enter her bedroom at night and fondle and touch her breasts and body. Michelle Keller, who was no longer a close friend, confirmed the conversation and corroborated the time period when the conversation occurred, namely four (4) or five (5) years prior to the filing of the Bills of Information.

In January, 1985, Barbara Purcell began seeing her first cousin, John Purcell, on a regular basis. He had been visiting the house constantly because of his friendship with the defendant. Barbara, who was not permitted to date other boys, began dating John on a daily basis; for almost one and one-half years they saw each other constantly. The couple went out socially, he escorted her to the two (2) high school proms she attended as well as numerous other dances; they did everything together. Mr. and Mrs. Purcell knew of this conduct and encouraged the relationship. It was during this time that Barbara Purcell fell in love with her cousin and became sexually intimate with him, including intercourse. Her love letters and admissions in court supported her plans to marry him.

The defense in this case, in addition to the defendant's denial, focused upon three areas. First, the defendant

claimed these repeated incidents of child abuse could not have occurred because he simply lacked the opportunity to have engaged in such sexual conduct without other family members being aware of it. To this extent the testimony of his wife and son was introduced to show that the defendant had no access to his daughter, or if he did, this access was for periods of very short duration.

Second, he insisted the motivation for these allegations emanated from the fact that he had ordered John Purcell from the house when he found his daughter and John having sexual intercourse on Sunday, May 18, 1986. John Purcell, who remains friendly with the defendant, testified on his behalf. He described the intensity of his relationship with the victim, an intensity which she candidly admitted, and confirmed that he had been struck by the defendant, and ordered from his house when he was caught being intimate with Barbara.

He did, however, admit that in a letter he had received from Barbara prior to May 18, 1986, she told him she wanted to explain to him what "goes on" at her house, and that she refused to go to guidance counseling for it. (Commonwealth's Exhibit No. 1). It is further interesting to note that this witness, knowing the victim loved him and favored his college plans, threatened to leave college to support the Purcell family if she didn't withdraw the prosecution in this case.

Defendant's third defense centered [around] several reputation witnesses who asserted he was a law abiding, honest citizen.

Our role in reviewing the weight of the evidence is limited. "The determination whether to grant a new trial on the ground that the verdict is against the weight of the evidence rests within the discretion of the trial court, and we will not disturb that decision absent an abuse of discretion." *Commonwealth v. Hunter*, 381 Pa.Super. 606, 617, 554 A.2d 550, 555 (1989). "A trial court should award a new trial on the ground that the verdict is against the weight of the evidence only when the jury's verdict is so

contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." *Commonwealth v. Whitney,* 511 Pa. 232, 239, 512 A.2d 1152, 1155–1156 (1986). "Where the evidence is conflicting, the credibility of the witnesses is solely for the jury, and if its finding is supported by the record, the trial court's denial of a motion for a new trial will not be disturbed." *Commonwealth v. Larew,* 289 Pa.Super. 34, 37, 432 A.2d 1037, 1038 (1981).

Instantly, appellant's challenge to the weight of the evidence is premised upon the contention that the jury's verdicts of not guilty on charges of rape, incest and involuntary deviate sexual intercourse constituted a finding that the victim's testimony had not been credible. This, he argues, rendered unreliable the verdicts of guilty on charges of indecent assault and corruption of a minor.[2] We disagree with this contention. A similar argument was rejected by the Superior Court in *Commonwealth v. Shaffer,* 279 Pa.Super. 18, 420 A.2d 722 (1980), where the Court reasoned as follows:

The fault with appellant's argument is that "[a]n acquittal cannot be interpreted as a specific finding in relation to some of the evidence." *Commonwealth v. Carter,* 444 Pa. 405, 408, 282 A.2d 375, 376 (1971), quoting *Commonwealth v. Parrotto,* 189 Pa.Super. 415, 422, 150 A.2d 396, 399 (1959). When an acquittal on one count in an indictment is inconsistent with a conviction on a second count, "the court looks upon [the] acquittal as no more than the jury's assumption of a power which they had no right to exercise, but to which they were disposed

2. Appellant further asserted in his post-trial motions that "[t]he verdict was insufficient to prove guilt beyond a reasonable doubt" and "[t]he verdict was contrary to law." Such boilerplate averments of error, however, are insufficient to preserve an issue for appellate review. See: *Commonwealth v. Pyeti,* 372 Pa.Super. 291, 294, 539 A.2d 444, 445 (1988); *Commonwealth v. Holmes,* 315 Pa.Super. 256, 461 A.2d 1268 (1983) (en banc). Moreover and in any event, when the evidence in the instant case is viewed in the light most favorable to the Commonwealth, it is clear that such evidence was sufficient to sustain the jury's verdicts on the charges of indecent assault and corruption of a minor.

through lenity." *Id. Accord: Commonwealth v. Strand,* 464 Pa. 544, 547, 347 A.2d 675, 676 (1975). Thus, consistency in a jury's verdicts in a criminal case is unnecessary, provided there is sufficient evidence to support the convictions the jury has returned, *Commonwealth v. Stegmaier,* 247 Pa.Super. 159, 371 A.2d 1376 (1977); *Commonwealth v. Dolny,* 235 Pa.Super. 241, 342 A.2d 399 (1975); *Commonwealth v. Jackson,* 230 Pa.Super. 386, 326 A.2d 623 (1974), and inconsistency in verdicts affords an accused no cause for relief, even though it may be difficult to reconcile the verdicts, *Commonwealth v. Kwatkoski,* 267 Pa.Super. 401, 406 A.2d 1102 (1979).

*Id.,* 279 Pa.Superior Ct. at 21–22, 420 A.2d at 724. See also: *Commonwealth v. Davis,* 388 Pa.Super. 224, 238, 565 A.2d 458, 465 (1989); *Commonwealth v. Maute,* 336 Pa.Super. 394, 406–407, 485 A.2d 1138, 1144–1145 (1984).

Upon carefully reviewing the record in the instant case, we are satisfied that there was sufficient evidence to sustain appellant's convictions for indecent assault and corruption of a minor. Indeed, the victim's testimony, standing alone, was sufficient to sustain these verdicts. See: *Commonwealth v. McIlvaine,* 385 Pa.Super. 38, 47, 560 A.2d 155, 159 (1989); *Commonwealth v. Ziegler,* 379 Pa.Super. 515, 520, 550 A.2d 567, 569 (1988). As such, inconsistency in the jury's verdicts does not entitle appellant to relief. *Commonwealth v. Shaffer, supra.* As we have already observed, it was for the jury to evaluate the credibility of the witnesses. The jury was free to believe all, part, or none of the evidence presented. *Commonwealth v. Rose,* 463 Pa. 264, 268, 344 A.2d 824, 826 (1975); *Commonwealth v. Verdekal,* 351 Pa.Super. 412, 419–420, 506 A.2d 415, 419 (1986). Moreover, the trial court has, in its post-trial opinion, exhaustively examined the trial evidence and determined that its conscience was not shocked by the jury's verdicts. We discern no basis for holding that the trial court abused its discretion when it refused to award appel-

lant a new trial on the ground that the verdict was contrary to the weight of the evidence.

Prior to trial, appellant made a motion in limine by which he sought to have seventeen love letters written by the victim to her cousin, John Purcell, admitted into evidence. Appellant asserted that the letters were relevant to demonstrate the victim's bias against him, in that he had broken up the relationship between the victim and her first cousin. Appellant also argued that the letters were relevant to demonstrate the source of the victim's knowledge of male physiology and sexual behavior. The Commonwealth, on the other hand, contended that introduction of the letters was barred by the Rape Shield Law, 18 Pa.C.S. § 3104. The trial court conducted an in camera hearing, examined the letters, and concluded that they were relevant to show bias. However, the court also concluded that some of the more sexually explicit references in the letters were so highly prejudicial that they should be removed from the letters prior to their introduction into evidence. Appellant now argues that the trial court's ruling unduly prevented him from establishing the intensity of the relationship between the victim and her cousin and prevented the jury from becoming aware of the victim's detailed knowledge of male anatomy and sexual behavior which resulted from this relationship.

In *Commonwealth v. Black*, 337 Pa.Super. 548, 487 A.2d 396 (1985), the Superior Court held that "insofar as the Rape Shield Law purports to prohibit the admission of evidence which may logically demonstrate a witness' bias, interest or prejudice or which properly attacks the witness' credibility, it unconstitutionally infringes upon an accused's right of confrontation under the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution." *Id.*, 337 Pa.Superior Ct. at 558, 487 A.2d at 401–402 (footnotes omitted). See also: *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). The *Black* Court, however, elaborated upon and limited its holding in the following manner:

While we hold that Pennsylvania's Rape Shield Law may not be used to exclude relevant evidence showing witness' bias or attacking credibility, we do not hold that all material evidence is necessarily admissible. Although logically relevant, evidence tending to show the victim's prejudice or lack of credibility may be excluded if "it would so inflame the minds of the jurors that its probative value is outweighed by unfair prejudice." *Commonwealth v. Stewart*, 304 Pa.Super. 382, 387, 450 A.2d 732, 734 (1982) (quoting *Commonwealth v. Strube*, 274 Pa.Super. 199, 216, 418 A.2d 365, 374 (1979) (citations omitted), *cert. denied*, 449 U.S. 992, 101 S.Ct. 527, 66 L.Ed.2d 288 (1980)). *Cf.* Fed.R.Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice....."). This balancing determination between probative value and unfair prejudice should be made by the trial court at an *in camera* hearing similar to that outlined in 18 Pa.C.S. § 3104(b). At this hearing, the trial court should determine the following as a matter of record to be preserved for appellate review: (1) whether the proposed evidence is relevant to show bias or motive or to attack credibility; (2) whether the probative value of the evidence outweighs its prejudicial effect; and (3) whether there are alternative means of proving bias or motive or to challenge credibility.

*Commonwealth v. Black, supra* 337 Pa.Super. at 557–558, 487 A.2d at 401 (footnote omitted). See also: *Commonwealth v. Reefer*, 393 Pa.Super. 193, 573 A.2d 1153 (1990); *Commonwealth v. Simmons*, 355 Pa.Super. 326, 513 A.2d 453 (1986); *Commonwealth v. Coia*, 342 Pa.Super. 358, 492 A.2d 1159 (1985).

Instantly, in its post-trial opinion, the trial court explained its reasons for excluding the more sexually explicit portions of the victim's letters as follows:

In an effort to balance probative value and unfair prejudice the Trial Judge reviewed each letter individually and then applied the three prong test enumerated in the

*Black* Case to all the letters considered. In some instances he merely deleted certain highly prejudicial language, permitting the bulk of the letter and its tenor to be considered by the Jury. In a few instances he deleted the entire letter because it was repetitive and unnecessary, or highly inflammatory. (Notes of Testimony, March 9, pp. 33–41).

Considered in their totality, the letters introduced at trial enabled the Jury to graphically understand the nature, longevity and intensity of the romantic and sexual relationship enjoyed by Barbara Purcell and John Purcell. Most of the deleted portions pertained to specific references to "Junior" the parties' nickname[ ] for the sexual organ of John Purcell, or other language of an equally inflaming nature.

Finally there did exist an alternative means of proving bias or motive, and challenging the prosecutrix's credibility at trial. First, John Purcell was permitted to testify in great detail on behalf of the defendant as to the particulars surrounding the sexual incident of May 18, 1986, and his removal from the defendant's house. He was also permitted to confirm that he began seeing Barbara Purcell on a more than social basis after January of 1985, that he loved her, was intimate with her and had even discussed marriage.

Of even greater significance is the fact that the Court allowed extensive cross-examination of the prosecutrix by defense counsel into these areas. This included being in her cousin's company on a daily basis, writing him love letters constantly, discussing marriage on many occasions, loving him, and having an incestuous relationship for about one (1) year. On no fewer than five (5) occasions at trial she was questioned on whether she had engaged in sexual intercourse with John Purcell and she unhesitatingly admitted her involvement. This testimony coupled with her letters, especially Exhibits D–1(f) and D–1(a), which were read to the jury, made her involvement with John Purcell quite clear. *See generally*, Notes of

Testimony, Trial, pp. 185–187. Anything additional would have only been for the purpose of inflaming or biasing the jury, rather than searching for the truth.

In applying the procedure recommended in *Black*, the trial court concluded that portions of the victim's letters should be excluded in order to avoid unnecessary prejudice. Decisions of this nature are discretionary with the trial court and will not be reversed in the absence of an abuse of discretion. See: *Commonwealth v. Dollman*, 518 Pa. 86, 91, 541 A.2d 319, 321–322 (1988); *Commonwealth v. Boyle*, 498 Pa. 486, 494, 447 A.2d 250, 254 (1982); *Commonwealth v. Strube*, 274 Pa.Super. 199, 216–217, 418 A.2d 365, 374 (1979), *cert. denied*, 449 U.S. 992, 101 S.Ct. 527, 66 L.Ed.2d 288 (1980). Here we can discern no abuse of discretion. The trial court permitted appellant wide latitude in attempting to prove his contention that the victim's testimony was influenced by bias. Moreover, it is eminently clear that appellant was permitted to establish fully his contention that the victim's sexual knowledge resulted from her relationship with her cousin rather than from any criminality on the part of appellant. Under these circumstances, we find no impairment of appellant's right of confrontation and no abuse of discretion on the part of the trial court.

During direct examination of appellant's wife, she testified that she had frequently waited up for appellant when he had been called to leave the house at night for business reasons. The trial judge interrupted this testimony and asked the witness, "[y]ou mean in the middle of the night, your husband would get called out of bed, you would be in a sound sleep at two o'clock at night ... and you would wake up and stay awake for him to come back?" To this question the witness replied, "Sometimes I would. I didn't say always. I said sometimes I would." Defense counsel requested a sidebar conference,[3] after which the trial court instructed the jury as follows:

3. This sidebar discussion was held off the record and is not a part of the trial transcript which has been certified to this Court on appeal.

The last question I asked, if my tone of voice imputed skepticism, I certainly did not intend that. So, obviously as I told you previously, you're the people that determine the credibility and not myself, not anyone else. I did not believe that that's what happened, but if it did, I apologize to you and also to the other people in this court.

Appellant asserts that he was unfairly prejudiced by the trial court's questioning of Mrs. Purcell.

"It is always the right and sometimes the duty of a trial judge to interrogate witnesses. However, questioning from the bench should not show bias or feeling or be unduly protracted." *Commonwealth v. Gibbs*, 387 Pa.Super. 181, 187, 563 A.2d 1244, 1247 (1989). See also: *Commonwealth v. Seabrook*, 475 Pa. 38, 44–45, 379 A.2d 564, 567–568 (1977); *Commonwealth v. Troop*, 391 Pa.Super. 613, 616, 571 A.2d 1084, 1086 (1990); *Commonwealth v. King*, 378 Pa.Super. 553, 556–558, 549 A.2d 195, 197 (1988). Concerning the questioning of a witness by the trial court, the Supreme Court has recently commented:

'Witnesses should be interrogated by the judge only when he conceives the interest of justice so requires. It is better to permit counsel to bring out the evidence and clear up disputed points on cross-examination unaided by the court; but where an important fact is indefinite or a disputed point needs to be clarified, the court may see that it is done by taking part in the examination.... Judges should refrain from extended examination of witnesses; they should not, during the trial, indicate an opinion on the merits, a doubt as to the witnesses' credibility, or do anything to indicate a leaning to one side or the other, without explaining to the jury that all these matters are for them.'

[*Commonwealth v. Myma*, 278 Pa. 505, 508, 123 A. 486, 487 (1924).]

That does not mean that a trial judge must sit idly by, a mere evidential technician, silenced in the face of the impossible, absurd, ambiguous or the frivolous. Nor should he leave unasked or unanswered questions that

center the matter or amplify relevant testimony on the question or issue. It is a false and dangerous neutrality that would allow loss of liberty or property when another question at further inquiry would gain the fact, expose a false or improper premise, interest or bias of a witness, or correct insinuation unfounded in the record. It is not partisan to maintain the wheel, steering evenly, between competing and often aggressive counsel, anxious to set the course. Nor should a judge yield the gavel to zealous partisans or allow counsel to impose their contentions by contumelious conduct. When others than the trial judge control the proceedings, one side has lost their day in court.

*Commonwealth v. Roldan*, 524 Pa. 366, 369, 572 A.2d 1214, 1215 (1990), quoting *Commonwealth v. Myma*, 278 Pa. 505, 508, 123 A. 486, 487 (1924). "A new trial is required ... only when the trial court's questioning is prejudicial, 'that is when it is of such nature or substance or delivered in such a manner that it may reasonably be said to have deprived the defendant of a fair and impartial trial.'" *Commonwealth v. Troop, supra*, quoting *Commonwealth v. Hammer*, 508 Pa. 88, 100, 494 A.2d 1054, 1060 (1985). See also: *Commonwealth v. Goosby*, 450 Pa. 609, 611, 301 A.2d 673, 674 (1973).

Instantly, we view the court's question to Mrs. Purcell as an attempt to clarify an earlier answer which the witness had given in response to defense counsel's questioning. Although the court's question may have been inartfully phrased, the court responded immediately to defense counsel's concerns and cautioned the jury that there was no intent on the court's part to imply skepticism of Mrs. Purcell's testimony. Moreover, at the start of trial, the court had thoroughly informed the jurors that it was their function to determine the facts and weigh the credibility of witnesses. The court had also told the jury that:

> You are not bound by any opinion you might think counsel or I have expressed concerning guilt or innocence, credibility of witnesses, weight of evidence, facts

proven by the evidence, or inferences to be drawn from those facts.

. . . .

I may question some of the witnesses myself. The questions will not reflect any opinion on my part about the evidence or about this case. My only purpose will be to inquire about matters which I feel that counsel may not have fully explored.

When viewed with the specific cautionary instruction given by the trial court and the general explanation of the jury's function, we are satisfied that the court's questioning of Mrs. Purcell was not prejudicial to the defense.[4]

" 'It is well settled that comments by the district attorney do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the [jurors], forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict.' " *Commonwealth v. Chew*, 338 Pa.Super. 472, 484, 487 A.2d 1379, 1385 (1985), quoting *Commonwealth v. Tabron*, 502 Pa. 154, 160, 465 A.2d 637, 639–640 (1983). See also: *Commonwealth v. Strong*, 522 Pa. 445, 454, 563 A.2d 479, 483 (1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1536, 108 L.Ed.2d 775 (1990); *Commonwealth v. Baker*, 511 Pa. 1, 17, 511 A.2d 777, 786 (1986). When evaluating claims of prosecutorial misconduct, "the prejudicial effect of the district attorney's remarks must be evaluated in the context in which they occurred." *Commonwealth v. Smith*, 490 Pa. 380, 388, 416 A.2d 986, 989 (1980). See also: *Commonwealth v. Carpen-*

4. Appellant also complains that, during the cross-examination of Mrs. Purcell, the trial court improperly rebuked the witness and admonished defense counsel not to help the witness testify. In neither of these instances, however, did defense counsel object to the trial court's conduct, nor were these contentions raised in post-trial motions. As such, these arguments have not been preserved for appellate review. See: *Commonwealth v. Butts*, 495 Pa. 528, 534, 434 A.2d 1216, 1219 (1981); *Commonwealth v. Gordon*, 364 Pa.Super. 521, 536, 528 A.2d 631, 638–639 (1987). Moreover, neither of these incidents was so prejudicial in nature as to require the granting of a new trial.

*ter,* 511 Pa. 429, 439, 515 A.2d 531, 536 (1986); *Commonwealth v. Toledo,* 365 Pa.Super. 224, 236, 529 A.2d 480, 486 (1987). The initial determination as to whether the prosecutor's remarks were unfairly prejudicial rests within the sound discretion of the trial court, and "our inquiry of necessity must turn to whether an abuse of discretion was committed." *Commonwealth v. Strong, supra,* citing *Commonwealth v. Simon,* 432 Pa. 386, 248 A.2d 289 (1968). "Moreover, when prompt curative or cautionary instructions are given by the court, an abuse of discretion will not readily be found." *Commonwealth v. Meadows,* 381 Pa.Super. 354, 360, 553 A.2d 1006, 1009 (1989). See also: *Commonwealth v. Lawson,* 519 Pa. 175, 546 A.2d 589 (1988); *Commonwealth v. Thomas,* 361 Pa.Super. 1, 15, 521 A.2d 442, 449 (1987).

The Supreme Court of Pennsylvania has established the following additional guidelines for evaluating a prosecutor's closing argument:

> [A] prosecutor, just as a defense attorney, must have reasonable latitude in presenting a case to the jury and must be free to present his or her arguments with "logical force and vigor." *Commonwealth v. Smith,* 490 Pa. 380, 387, 416 A.2d 986 (1980), *quoting Commonwealth v. Cronin,* 464 Pa. 138, 143, 346 A.2d 59, 62 (1975). Counsels' remarks to the jury may contain fair deductions and legitimate inferences from the evidence presented during the testimony. *Commonwealth v. Fairbanks,* 453 Pa. 90, 306 A.2d 866 (1973); *Commonwealth v. Stevens,* 276 Pa.Super. 428, 419 A.2d 533 (1980). The prosecutor may always argue to the jury that the evidence establishes the defendant's guilt, *Commonwealth v. Capalla,* 322 Pa. 200, 185 A. 203 (1936) although a prosecutor may not offer his personal opinion as to the guilt of the accused either in argument or in testimony from the witness stand. *Commonwealth v. DiNicola,* 503 Pa. 90, 468 A.2d 1078 (1983); *Commonwealth v. Pfaff,* 477 Pa. 461, 384 A.2d 1179 (1978); *Commonwealth v. Cronin, supra.* Nor may he or she express a personal belief and opinion

as to the truth or falsity of evidence of defendant's guilt, including the credibility of a witness. *Commonwealth v. Kuebler*, 484 Pa. 358, 399 A.2d 116 (1979) (where defendant's version of events was branded a "big lie"); ABA Standards for Criminal Justice, Standards Relating to the Prosecution Function Section 5.8(b) (Approved Draft, 1971).

*Commonwealth v. D'Amato*, 514 Pa. 471, 489–490, 526 A.2d 300, 309 (1987). See also: *Commonwealth v. Bullock*, 384 Pa.Super. 269, 278–279, 558 A.2d 535, 539–540 (1989); *Commonwealth v. Yabor*, 376 Pa.Super. 356, 370–371, 546 A.2d 67, 74 (1988). Furthermore, "the prosecution may, in its closing address, attempt to meet the pleas and arguments made by defense counsel in his summation." *Commonwealth v. Brown*, 489 Pa. 285, 302 n. 6, 414 A.2d 70, 78–79 n. 6 (1980). See also: *Commonwealth v. Van Cliff*, 483 Pa. 576, 584, 397 A.2d 1173, 1177 (1979), *cert. denied*, 441 U.S. 964, 99 S.Ct. 2412, 60 L.Ed.2d 1070 (1979); *Commonwealth v. Perkins*, 473 Pa. 116, 132–136, 373 A.2d 1076, 1084–1086 (1977). Thus, "a prosecutor's remark concerning the credibility of a witness does not constitute reversible error where it is 'motivated by, and was commensurate with the prior attacks [by defense counsel] upon the credibility of' the Commonwealth's witnesses." *Commonwealth v. Gwaltney*, 497 Pa. 505, 513, 442 A.2d 236, 240 (1982), quoting *Commonwealth v. Stoltzfus*, 462 Pa. 43, 337 A.2d 873 (1975). See also: *Commonwealth v. Barren*, 501 Pa. 493, 499, 462 A.2d 233, 235 (1983).

■ At the conclusion of the prosecuting attorney's closing argument, defense counsel objected to references which had been made to the preliminary hearing and to the suggestion that certain spectators at the trial had tried to intimidate the victim and the prosecuting attorney. The remarks alleged to have been improper were as follows:

Can we turn our eyes and our backs and say that never happens? Every one of these victims fabricates the whole thing because they're unhappy with their home lives? Would a person go through this trauma of two-

and-a-half hours of arduous cross-examination? This isn't the first time. There was a preliminary hearing, ladies and gentlemen. Two-and-a-half hours of cross-examination by that man, and did she flinch? Why? I submit to you because she was telling the truth, she has nothing to hide.

. . . .

Ladies and gentlemen of the jury, I'm sure you took notice to all the people sitting in the courtroom. Little comments may have been shouted out throughout the trial. I submit to you those people are there for one reason, to intimidate Barbara Purcell, to stare at her while she is testifying.

There is a preliminary hearing; packed the courtroom. There is a trial; packed the courtroom.

The people laughed during questioning. This isn't a joke. People shout things out, heckling. Why? To intimidate me. I think they wanted to intimidate me or Barbara. That's why they're there, ladies and gentlemen of the jury.

In response to defense counsel's objection to these comments by the prosecutor, the trial court delivered the following instruction to the jury:

THE COURT: Ladies and gentlemen, in a few moments I'm going to give you the law in this case as far as the final charge is concerned, but I'm going to take a recess first.

But, before I do that, there are several comments that I want to make to you because they relate to the argument, the arguments that were just given and presented.

First of all, I want you to strike from your mind any statement by the Commonwealth in their argument that they felt—of the evidence as it related to the preliminary hearing. There was mention of a preliminary hearing at one point—I believe it was either on direct or cross-examination by Mr. McAllister, but specifically, the items that I'm wishing—I'm ordering you to strike from your

mind is the reference to the fact that the preliminary hearing was packed. Whether or not the preliminary hearing was packed was never introduced into evidence in this case and, therefore, it is not a proper consideration for the jury.

Do you believe you can follow that instruction? Is there anyone who believes they cannot?

(No response.)

THE COURT: All right, I see no hand.

Also, there was a reference to the fact by the prosecutor that there were people in this courtroom that were here to intimidate her and/or the witnesses, especially Barbara Purcell.

It's true that this courtroom is packed. There's never been any testimony as to who these particular people are associated with.

You have a right as jurors to make any observations that you've made here in court while sitting as a juror. However, the reference of intimidation, or at least the prosecutor's concept of the fact that she felt intimidated, or the victim, they were here to intimidate the victim, must also be stricken from your memories and not be considered by you in any context.

If there's any juror here who cannot follow that instruction? And if you can't, I want you to raise your hand.

(No response.)

THE COURT: All right, I see no hands.

Finally, there were comments about laughter and certain things that occurred during the courtroom.

The jury sat here. There were times when comments were made that obviously were in a jocular manner. There was, however, one outburst where I did clear two people from the courtroom, and I think quite properly. I do not know with whom those people were associated, if anyone. They might have been mere spectators.

So, therefore, any indication that might have emanated from the lips of the prosecutor that those people could be

attributed to the Defendant or to his attorney are totally improper and, again, if you cannot strike that from your mind—I'm ordering you to strike that from your mind and not consider it, and if there's anyone here who cannot do that, I would want you to raise your hand, and I'm asking you, obviously, to be totally candid with the Court in these areas because it's a serious matter. Is there anyone who cannot follow that instruction?

(No response.)

THE COURT: All right.

After carefully considering the comments of the prosecuting attorney, we agree with the trial court that the comments were not so prejudicial that they impaired appellant's right to receive a fair trial. The trial court's extensive curative instruction was adequate to remove any prejudice which might otherwise have resulted from the prosecuting attorney's reference to matters not in evidence. Therefore, we conclude that the trial court did not err when it refused to award a new trial because of the prosecuting attorney's remarks.

Appellant also alleges prosecutorial misconduct because of remarks by the prosecuting attorney: (1) regarding an episode of the Oprah Winfrey Show which dealt with incest; (2) that the investigating police detective believed the victim's version of events; and (3) which were unfairly disparaging of defense character witnesses. These arguments, however, have not been preserved for appellate review, for there were no objections at trial. " 'It is fundamental that the parties in a trial are obligated to inform the court of alleged violations of evidence law or trial procedure, and that failure to so inform the court by a timely and specific objection, motion, exception, request, or offer of proof will constitute a waiver of that ground for relief.' " *Commonwealth v. Schneider*, 386 Pa.Super. 202, 214, 562 A.2d 868, 874 (1989), quoting Packel & Poulin, Pennsylvania Evidence, Ch. I, § 103 at p. 5 (1987). "[T]he failure to raise an issue, objection, or argument in a timely manner during trial forecloses further review of an alleged error in post-trial

motions or at the appellate level." *Commonwealth v. Johnson*, 368 Pa.Super. 427, 435, 534 A.2d 511, 515 (1987). See also: *Commonwealth v. Clair*, 458 Pa. 418, 326 A.2d 272 (1974); *Commonwealth v. Gordon*, 364 Pa.Super. 521, 534–537, 528 A.2d 631, 638–639 (1987).

Recently, in *Commonwealth v. Gainer*, 397 Pa.Super. 348, 580 A.2d 333 (1990), the Superior Court, sitting en banc, summarized the law to be used in evaluating claims of ineffective assistance of counsel in the following manner:

> In *Commonwealth v. House*, 371 Pa.Super. 23, 537 A.2d 361 (1988), the Court said:
>
>> Because the law presumes that counsel is effective, the burden of establishing ineffectiveness rests with appellant. *Commonwealth v. Floyd*, 506 Pa. 85, 90, 484 A.2d 365, 367 (1984); *Commonwealth v. McKendrick*, 356 Pa.Super. 64, 71, 514 A.2d 144, 148 (1986), *allo. denied*, 514 Pa. 629, 522 A.2d 558 (1987). To meet that burden, appellant must demonstrate that 1) the issue underlying his claim of ineffectiveness is of arguable merit; 2) the course chosen by counsel had no reasonable basis designed to serve his interests; and 3) he suffered prejudice as a result of counsel's ineffectiveness. *Commonwealth v. Pierce*, 515 Pa. 153, 158–160, 527 A.2d 973, 975–76 (1987); *Commonwealth v. Buehl*, 510 Pa. 363, 378–79, 508 A.2d 1167, 1174–75 (1986); *Commonwealth ex rel. Washington v. Maroney*, 427 Pa. 599, 604–5 & n. 8, 235 A.2d 349, 352–53 & n. 8 (1967).
>
> *Id.*, 371 Pa.Superior Ct. at 28, 537 A.2d at 363. See: *Commonwealth v. Davis*, 518 Pa. 77, 83, 541 A.2d 315, 318 (1988); *Commonwealth v. Riggins*, 374 Pa.Super. 243, 248–249, 542 A.2d 1004, 1007 (1987). Establishing prejudice "requires [a] showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984). Moreover,

> "[b]efore a claim of ineffectiveness can be sustained, it must be determined that, in light of all the alternatives available to counsel, the strategy actually employed was so unreasonable that no competent lawyer would have chosen it." *Commonwealth v. Miller*, 494 Pa. 229, 431 A.2d 233 (1981). We inquire whether counsel made an informed choice, which at the time the decision was made reasonably could have been considered to advance and protect defendant's interests. See *Commonwealth v. Hill*, 450 Pa. 477, 301 A.2d 587 (1973). Thus, counsel's assistance is deemed constitutionally effective once we are able to conclude the particular course chosen by counsel had some reasonable basis [designed] to effectuate his client's interests. The test is not whether other alternatives were more reasonable, employing a hindsight evaluation of the record. *Commonwealth ex rel. Washington v. Maroney*, 427 Pa. 599, 604, 235 A.2d 349 (1967).

> *Commonwealth v. Dunbar*, 503 Pa. 590, 596, 470 A.2d 74, 77 (1983). See also: *Commonwealth v. Akers*, 392 Pa.Super. 170, [189–190], 572 A.2d 746, 755–756 (1990); *Commonwealth v. Harner*, 377 Pa.Super. 229, 243–244, 546 A.2d 1241, 1247–1248 (1988).

*Id.*, 397 Pa.Superior Ct. at 352, 580 A.2d at 335.

Appellant contends that trial counsel was constitutionally ineffective for failing to challenge the expert testimony of Sandra Steiker because her testimony was irrelevant and was offered by the Commonwealth solely to bolster the credibility of the victim.[5] Ms. Steiker, a clinical social worker, testified for the Commonwealth concerning the general dynamics of child sexual abuse and incest. Prior to testifying, the witness had not examined the victim and had no specific knowledge of the facts of this case. Her testimony, therefore, was of a general nature. She identified psychological factors and behavioral traits which, she said, were commonly exhibited by victims of child sexual abuse

---

5. The only objection to Ms. Steiker's testimony offered at trial was that the witness was not qualified to testify as an expert.

and incest. She testified also that it was common for child victims of sexual abuse not to report the abuse for a number of years and to have difficulty remembering certain specific details surrounding the incidents of abuse. The Commonwealth argues that Ms. Steiker's testimony was relevant to help explain the victim's delay in reporting the sexual abuse, and that such testimony did not comment upon the victim's credibility or upon the credibility of child sexual abuse victims in general.

The first case to consider the use of expert testimony in child abuse cases was *Commonwealth v. Baldwin*, 348 Pa.Super. 368, 502 A.2d 253 (1985). There a panel of the Superior Court held that expert testimony was relevant and proper to explain to a jury the psychological and behavioral characteristics of child abuse victims. Subsequently, the holding in *Baldwin* was limited by another panel of the Superior Court which held that:

> *Baldwin* does not provide carte blanche admissibility of expert testimony of this nature in every child sexual abuse case. Rather, before testimony is admitted on the psychological dynamics of child sexual abuse and the associated behavioral patterns of the victims, the trial judge, in every case, must determine whether it is relevant to the facts in issue.

*Commonwealth v. McNeely*, 368 Pa.Super. 517, 521, 534 A.2d 778, 780 (1987). *McNeely* held, therefore, that expert testimony discussing the general dynamics of child sexual abuse was inadmissible on grounds that it had general informational value. To be admissible, such testimony had to "be offered to further its proponent's position on a specific issue at trial." *Id.*, 368 Pa.Superior Ct. at 523–524 & n. 3, 534 A.2d at 781 & n. 3.

More recent decisions of both the Supreme and Superior Courts have largely rejected the principles underlying *Baldwin* and *McNeely*, and little, if anything, remains of their holdings. Today, the law is clear that an expert witness may not offer an opinion on the issue of a witness' credibility. *Commonwealth v. O'Searo*, 466 Pa. 224, 228–

229, 352 A.2d 30, 32 (1976). In *Commonwealth v. Seese*, 512 Pa. 439, 517 A.2d 920 (1986), the Supreme Court determined that the testimony of an expert witness, who had said that it was very unusual for young children to lie about being sexually abused, had improperly usurped the jury's credibility determining function. Subsequently, in *Commonwealth v. Davis*, 518 Pa. 77, 541 A.2d 315 (1988), the Supreme Court held that it was improper to allow testimony by a child psychologist that children who had not been involved in any type of sexual activity usually did not fantasize about sexual experiences. The Court reasoned:

> Subsequent to the *Baldwin* decision, this Court decided *Commonwealth v. Seese*, 512 Pa. 439, 517 A.2d 920 (1986). The *Seese* decision unequivocally prohibited testimony such as that rendered by [the expert] in this case. The expert in *Seese* testified as follows:
>
>> It is very unusual that a child would lie about sexual abuse.... [P]repubertal children usually do not lie about matters of sexual abuse no matter how chaotic or uncomfortable their home situation is, one, because they don't know how to lie about it. They don't know what to say. It's not part of the life experience, so everything they say is something they have seen or experienced. It would be very unusual for them to lie.
>
> *Id.*, 512 Pa. at 441–42, 517 A.2d at 921. We summarized the expert's testimony in *Seese* by stating that:
>
>> the essence of [the expert's] response was that, based upon her own experience, young children usually do not fabricate stories of sexual abuse because they do not have sexual knowledge sufficient to supply details regarding sexual encounters. Thus, the testimony consisted of expert opinion as to the veracity of the class of potential witnesses of which the victim was a member.
>
> *Id.* We noted that the veracity of a particular witness is a question which must be answered in reliance on the ordinary experiences of life, common knowledge of the natural tendencies of human nature, and observations of

the character and demeanor of the witness. As the phenomenon of lying is within the ordinary capacity of jurors to assess, the question of a witness's credibility is reserved exclusively for the jury.... The quoted testimony in *Seese* was condemned as "an invitation for the trier of fact to abdicate its responsibility to ascertain the facts relying upon the questionable premise that the expert is in a better position to make such a judgment," quoting *O'Searo, supra. Seese,* 512 Pa. at 443–44, 517 A.2d at 922. We concluded:

> Such testimony, admitted as evidence, would encourage jurors to shift their focus from determining the credibility of the particular witness who testified at trial, allowing them instead to defer to the so-called "expert" assessment of the truthfulness of the class of people of which the particular witness is a member.

*Id.*

There is no question that the prohibition of *Seese* applies squarely to the testimony given by the Commonwealth expert in this case. It, too, was an " 'expert' assessment of the truthfulness of the class of people of which the particular witness is a member"; indeed, [the expert's] testimony was virtually identical to that of the *Seese* expert.

*Id.,* 518 Pa. at 81–83, 541 A.2d at 317.

In *Commonwealth v. Gallagher,* 519 Pa. 291, 547 A.2d 355 (1988), the expert witness had not commented directly upon the credibility of the victim or upon that of the general class of victims. Instead, the testimony had pertained to rape trauma syndrome and its effect upon a victim's memory. The expert opined that the victim had suffered from rape trauma syndrome and explained the manner in which that might affect her identification of the defendant. The Supreme Court held that the testimony was improper as an attempt to bolster the victim's credibility. The Court said:

> The crux of the testimony appears to be that the victim's failure to identify the appellant two weeks after the rape is unremarkable, as she was in the acute phase

of RTS in which a victim has difficulty performing even normal functions, and the in-court identification five years later is particularly credible, as it results from a flashback, with the mind operating like a computer. It is clear that the only purpose of the expert testimony was to enhance the credibility of the victim.

We stated in *Seese, supra:*

> The question of whether a particular witness is testifying in a truthful manner is one that must be answered in reliance upon inferences drawn from the ordinary experiences of life and common knowledge as to the natural tendencies of human nature, as well as upon observations of the demeanor and character of the witness.... [T]he question of a witness' credibility has routinely been reserved exclusively for the jury. 512 Pa. at 443, 517 A.2d at 922 (citations omitted; emphasis added). Such testimony would invest the opinions of experts with an unwarranted appearance of authority on the subject of credibility, which is within the facility of the ordinary juror to assess.

*Commonwealth v. Gallagher, supra* 519 Pa. at 297, 547 A.2d at 358 (footnote omitted).

Relying upon the aforementioned Supreme Court decisions, the Superior Court has held that "testimony which matches up the behavior of known victims of child sexual abuse with that of an alleged victim can serve no purpose other than to bolster the credibility of the alleged victim, and this purpose is patently prohibited." *Commonwealth v. Emge,* 381 Pa.Super. 139, 144, 553 A.2d 74, 76 (1988). See also: *Commonwealth v. Higby,* 384 Pa.Super. 619, 559 A.2d 939 (1989); *Commonwealth v. Zamarripa,* 379 Pa.Super. 208, 549 A.2d 980 (1988); *Commonwealth v. Ferguson,* 377 Pa.Super. 246, 546 A.2d 1249 (1988). Compare: *Commonwealth v. Cepull,* 390 Pa.Super. 167, 568 A.2d 247 (1990).

Instantly, the trial court allowed the expert testimony as an explanation for the alleged victim's failure to make prompt complaint of the abuse inflicted upon her by her

father. The Commonwealth argues that the evidence was relevant for this purpose and that it was not unfairly prejudicial to the defendant because it did not compare the victim's behavior with a known class of victims of similar abuse.[6] As such, the Commonwealth contends, the testimo-

---

6. This task was left to the prosecuting attorney, who made the following comparison in her closing argument:

The Commonwealth's next witness was Sandra Steiker, who has been a clinical social worker, geez, I even forget, eight, nine years, who told you the symptoms, psychological factors, behavioral indicators of incest and child sexual abuse.

Guilt. You saw Barbara. Damaged goods. Powerlessness. Putting up for so long. She was frightened of her father. She was suicidal. Poor social skills.

Did she tell you that she had a lot of friends? Repressed anger. Impaired ability to trust. Ladies and gentlemen of the jury, you saw her and you heard what the expert said. Now, put the two together. They're similar.

Because she said, Sandra Steiker, that all cases like this are similar, I submit oftentimes that incest victims mirror each other. It's unbelievable how much they mirror each other. Each of the factors that are present, it's unbelievable, but it's human beings. We all react so similarly to horrible things in our lives.

What about the bribery Sandra Steiker said comes with incest? That man told you right there he bought his daughter two cars. I submit I begged for years and never got a car. That's the bribery she is talking about. Barbara sat there and told you that she got everything she wanted. Everything. Isn't that the bribery Miss Steiker was talking about?

What about the Defendant telling Barbara that it would kill her mother if she knows? Don't tell your mother. To a small child growing up, a pattern situation such as incest, these little comments oftentimes prove threatening to a young child, so threatening that two of Sandra Steiker's patients that are seeing her right now have never told anyone about the incest they were subjected to, never told anyone.

Mr. McAllister made many comments about where's the physical evidence. I'm not an expert in child sexual abuse, but Sandra Steiker is. This Court said she was. What did she tell you about physical evidence? What did she say, ten percent of the cases? I forget. Use your memories. Five percent, maybe? She said five percent of the cases she's seen, there was physical—gonorrhea, or some kind of venereal disease, or pregnancy. That Defendant had a vasectomy; pregnancy is out.

Barbara showed almost all eleven psychological factors to you yesterday. Does a child fake those emotions? Does a child subject herself to this? I submit to you not. Why has sexual—child sexual abuse—why has it become an expertise? Because we, as a non-perpetrating society, look at it in shock and disbelief and horror. How can a man do this to his own daughter? You're probably

ny of the expert did not usurp the jury's credibility determining function and merely explained behavioral and psychological characteristics of child abuse victims which were not generally known by lay persons. The decided cases have held otherwise.

In *Commonwealth v. Gibbons*, 383 Pa.Super. 297, 556 A.2d 915 (1989), the testimony of the expert was similar to that offered in the instant case. There, a psychologist had testified concerning the general dynamics of child sexual abuse and the behavioral patterns of its victims. The testimony also referred to the likelihood of non-disclosure by victims and their inability to remember details of the abusive acts. The trial court in *Gibbons* had concluded that the psychologist's testimony was relevant in that the jury could infer therefrom that gaps and inconsistencies in the victim's testimony had resulted from the psychological trauma associated with incest rather than from fabrication or fantasy. On appeal, the Superior Court determined that the testimony improperly bolstered the victim's credibility. The Court reasoned as follows:

> In *Emge*, the Commonwealth's psychologist, Dr. Anthony Mannarino, testified as to "[w]hether the changes in the child's behavior in this case were 'consistent with, generally speaking, a victim of child sexual abuse....'" *Id.*, 381 Pa.Superior Ct. at 143, 553 A.2d at 76. The panel concluded that testimony "which matches up the behavior of known victims of child sexual abuse with that of an alleged victim can serve no purpose other than to bolster the credibility of the alleged victim, and this purpose is patently prohibited." *Id., citing, Commonwealth v. Rounds*, 518 Pa. 204, 207, n. 4, 542 A.2d 997, 999, n. 4 (1988); *Commonwealth v. Davis*, 518 Pa. 77, 541 A.2d 315 (1988); *Commonwealth v. Seese*, 512 Pa. 439, 517 A.2d 920 (1986).

sitting there saying how could this happen? Ladies and gentlemen of the jury, I submit to you it does. Unfortunately, happens more than we are aware of.

The Commonwealth argues strenuously that Dr. Kane's testimony was necessary because "[t]he [appellant's] entire case rested on alleged inconsistencies with the victim's behavior and words, and without the expert testimony proffered by Dr. Kane, the jury would have had no idea whether these were truly inconsistencies indicating the victim was a liar or whether ... the victim's actions and words were representative of a mechanism of coping...." Appellee's Brief at 8. We note that in the instant case, as opposed to what occurred in *Commonwealth v. Emge*, the psychologist did not testify that the accusing child's behavior matched the behavior of known victims of child sexual abuse. Nevertheless, we can only conclude that the probative value of Dr. Kane's testimony is clearly outweighed by the prejudicial impact of admitting it. "A defendant would find little solace in the knowledge that [his] conviction resulted from the jury's belief that the accuser acted in a way that child sexual abuse victims are believed to act, as a class." *Commonwealth v. Emge*, 381 Pa.Superior Ct. at 143, 553 A.2d at 76. In this case, as in *Commonwealth v. Emge, supra*, the jury had the opportunity to see, hear, and evaluate the child accuser's testimony, as well as that of the other prosecution witnesses, in light of the appellant's own testimony and that of the defense witnesses. "Our faith lies in the jurors' ability to rely on the ordinary experience of life, their common knowledge of the natural tendencies of human nature—including those of a child—and their observations of the character and demeanor of the opposing witnesses." *Commonwealth v. Emge*, 381 Pa.Superior Ct. at 145, 553 A.2d at 77.

*Commonwealth v. Gibbons, supra*, 383 Pa.Superior Ct. at 300–301, 556 A.2d at 916–917.

Finally, in *Commonwealth v. Dunkle*, 385 Pa.Super. 317, 561 A.2d 5 (1989), *allocatur granted*, 524 Pa. 625, 574 A.2d 67 (1990), the Commonwealth introduced expert testimony pertaining to the dynamics of interfamily sexual abuse and behavior patterns of a child victim in order to explain the

victim's failure to report incidents of sexual abuse prompt-ly. In holding such expert testimony to be impermissible, the Superior Court reasoned:

The question of a witness's credibility is reserved exclusively for the jury. *Commonwealth v. Davis*, 518 Pa. 77, 541 A.2d 315 (1988); *Commonwealth v. Gallagher*, 519 Pa. 291, 547 A.2d 355 (1988). As such, expert testimony which serves to bolster the veracity of a child sexual abuse victim impermissibly infringes upon the province of the jury. *Commonwealth v. Seese*, 512 Pa. 439, 517 A.2d 920 (1986). Accordingly, this Court must ascertain the purpose for which Ms. Shades' testimony was offered.

In *Seese, supra,* the Pennsylvania Supreme Court determined that the expert testimony in question consisted of expert opinion regarding the veracity of the victim. In part, the expert had testified that:

It is very unusual that a child would lie about sexual abuse ... [P]repubertal children usually do not lie about matters of sexual abuse no matter how chaotic or uncomfortable their home situation it ...

*Seese,* 512 Pa. at 441–442, 517 A.2d at 921.

Upon determining that this testimony was offered to sustain the credibility of the victim, the Court determined that it was inadmissible. In doing so, the Court stated that:

Such testimony, admitted as evidence, would encourage jurors to shift their focus from determining the credibility of the particular witness who testified at trial, allowing them instead to defer to the so-called "expert" assessment of the truthfulness of the class of people of which the particular witness is a member.

*Seese,* 512 Pa. at 443–44, 517 A.2d at 922. As such, the primary concern with regard to this type of testimony is that it has the potential to invade upon the province of the jury and incorrectly influence their decision as to the credibility of a witness.

Instantly, upon review of the record, it is apparent that the victim questionably delayed in reporting the incident

and failed to recall certain details of the incident. As such, the credibility of the victim was somewhat shaky. In response, the Commonwealth offered the expert testimony of Ms. Shade to explain: (1) a victim's delay in reporting an offense; (2) a victim's inability to recall exact dates and times; and (3) the victim's behavior as the result of the offense. In offering this testimony, the Commonwealth clearly hoped to legitimize the victim's lengthy delay in reporting the incident and her failure to recall certain details of the incident, thereby allowing the jury to accept her version of the facts. In essence, this only serves to bolster the credibility of the victim. Since, however, an expert's testimony may not be utilized solely to enhance the veracity of a witness, we find that the trial court erred in admitting the expert testimony of Susan Shade.

*Id.* 385 Pa.Super. at 324–325, 561 A.2d at 8–9.

 The decisions of the Supreme and Superior Courts instruct, therefore, that expert testimony on the dynamics of child sexual abuse may not be used by the Commonwealth to bolster the credibility of an alleged victim of child abuse. Instantly, the victim had not reported appellant's alleged acts of sexual abuse until approximately six and one-half years after the first incident. She said that she had not reported the abuse because she was fearful, embarrassed and did not want to hurt her mother. The defense, on the other hand, maintained that the victim's failure to report the same promptly evidenced that her testimony was a fabrication, offered as revenge for appellant's breaking up the relationship between his daughter and her cousin. Under these circumstances, it was for the jury to evaluate the credibility of the victim and appellant and to determine the true reasons underlying the victim's failure to make prompt complaint. The introduction of expert testimony that child victims, as a class, often do not make prompt reports of sexual abuse, allowed the Commonwealth to bolster the victim's credibility by establishing that she acted consistently with other known victims of child sexual abuse.

This, the case law holds, is an impermissible use of expert testimony. See: *Commonwealth v. Dunkle, supra; Commonwealth v. Gibbons, supra; Commonwealth v. Emge, supra.* See also: *Commonwealth v. Gallagher, supra; Commonwealth v. Davis, supra; Commonwealth v. Seese, supra.* We conclude, therefore, that appellant's claim of ineffective assistance by counsel for failing to object to the expert, psychological testimony has arguable merit.[7]

There is also arguable merit in appellant's assertion that trial counsel was constitutionally ineffective for failing to request a jury instruction regarding the statute of limitations applicable to charges of indecent assault and corruption of a minor. Appellant was charged by criminal complaint on June 30, 1986 with engaging in a course of sexual conduct with his daughter which began on January 1, 1979 and continued until May 17, 1986. The statute of limitations applicable to charges of indecent assault and corrupting a minor is two years. See: 42 Pa.C.S. § 5552. In 1985, however, the legislature enacted a statute designed to toll the statute of limitations in cases such as this. The statute provides in pertinent part:

§ 5554. **Tolling of statute**

Except as provided by section 5553(e) (relating to disposition of proceedings within two years), the period of limitation does not run during any time when:

. . . .

(3) a child is under 18 years of age, where the crime involves injuries to the person of the child caused by the wrongful act, or neglect, or unlawful violence, or negligence of the child's parents or by a person responsible for the child's welfare, or any individual residing

---

**7.** Although several of the previously cited cases were decided subsequent to appellant's trial, it was established law at the time of trial that expert testimony was impermissible for the purpose of bolstering the credibility of a witness. See: *Commonwealth v. Seese, supra; Commonwealth v. O'Searo, supra.* Therefore, counsel's failure to object to Ms. Steiker's testimony cannot be explained as a mere failure to predict future developments in the law.

in the same home as the child, or a paramour of the child's parent.

42 Pa.C.S. § 5554(3).

This has been interpreted as tolling the statute of limitations with respect to offenses for which prosecution was not time barred on the effective date of the statute. *Commonwealth v. Bell*, 378 Pa.Super. 573, 549 A.2d 205 (1988). See also: *Commonwealth v. Johnson*, 520 Pa. 165, 553 A.2d 897 (1989) (amendment extending statute of limitations for rape from two to five years applied to all prosecutions which were not already time barred under former two year limitations period); *Commonwealth v. Harvey*, 374 Pa.Super. 289, 542 A.2d 1027 (1988) (same). The effective date of Section 5554(3) was September 8, 1985. Therefore, the effect of section 5554(3) was to toll the running of the statute of limitations only for acts involving offenses of indecent assault and corrupting a minor committed on or after September 9, 1983. Offenses committed prior to September 9, 1983 were time barred under the two year statute of limitations. See: *Commonwealth v. Bell, supra.* Cf. *Commonwealth v. Guimento*, 341 Pa.Super. 95, 97–98, 491 A.2d 166, 167–168 (1985) ("[A]n extension of a statute of limitation cannot revive a case in which the statutory period has run.").

The law is clear that "criminal liability may not be imposed upon acts committed outside the limitations period." *Commonwealth v. Thek*, 376 Pa.Super. 390, 400, 546 A.2d 83, 89 (1988); *Commonwealth v. Allem*, 367 Pa.Super. 173, 182 n. 3, 532 A.2d 845, 849 n. 3 (1987). See: *Commonwealth v. Bethlehem*, 391 Pa.Super. 162, 171, 570 A.2d 563, 568 (1989) ("Under Pennsylvania law, the Commonwealth is required to prove as an element of every criminal offense that an applicable statute of limitations did not bar prosecution."). See also: *Commonwealth v. Fanelli*, 377 Pa.Super. 555, 566, 547 A.2d 1201, 1207 (1988) (Beck, J., concurring); 18 Pa.C.S. § 103. However, although a conviction may not be based upon acts committed outside the limitations period, in prosecutions involving a continuing course

of sexual abuse, the Commonwealth may " 'introduce evidence of prior illicit relations between the parties although such evidence disclosed other indictable offenses of like nature which were barred by the statute of limitations.' " *Commonwealth v. Niemetz*, 282 Pa.Super. 431, 444, 422 A.2d 1369, 1376 (1980), quoting *Commonwealth v. Leppard*, 271 Pa.Super. 317, 319, 413 A.2d 424, 425 (1979), quoting *Commonwealth v. Bell*, 166 Pa. 405, 412, 31 A. 123, 124 (1895). See also: *Commonwealth v. Thek, supra* 376 Pa.Super. at 402 n. 9, 546 A.2d at 89 n. 9; *Commonwealth v. Rodriguez*, 343 Pa.Super. 486, 493–494, 495 A.2d 569, 573 (1985).

As we have already observed, the informations charging appellant with indecent assault and corrupting a minor were based on "various acts" allegedly committed between January 1, 1979 and May 17, 1986. Conduct occurring prior to September 9, 1983, however, should not have been a basis for conviction, for prosecution therefor was barred by the two year statute of limitations. A conviction was nevertheless made possible because trial counsel did not raise the statute of limitations as a defense and did not request a jury instruction limiting the acts for which a finding of guilt could be returned. Indeed, trial counsel did not even record an objection when the court charged that:

> In cases such as the instant one where the charges are alleged to have happened over a period of time, if you find beyond a reasonable doubt that the elements of any charges have been proven at least on one occasion, then you must find the Defendant guilty of that crime.

By this instruction, the court permitted the jury to consider not only acts by appellant within the statute of limitations, but also acts which were committed outside the period of limitations. It is possible, therefore, that appellant's convictions for indecent assault and corrupting a minor were based upon conduct outside the statutory period.

The evidence in the instant case, offered by the Commonwealth, suggested that various acts of abuse occurred both within and without the limitations period. Therefore, the

jury should have been instructed that it could not find appellant guilty of indecent assault and corrupting a minor on the basis of acts which had been committed prior to September 9, 1983. " 'Where a question of fact is involved it is for the jury to say whether a prosecution was begun within the period of limitations....' " *Commonwealth v. Groff,* 378 Pa.Super. 353, 371, 548 A.2d 1237, 1246 (1988), quoting 23A C.J.S. *Criminal Law* § 1132 (1961). Inasmuch as the jury was not instructed on the applicable statute of limitations and the trial evidence included acts committed outside that period, it is possible that appellant's convictions were based upon conduct outside the limitations period. Therefore, there is arguable merit in this appellant's contention that trial counsel ineffectively represented him with respect to the statute of limitations.

Although appellant's averments of ineffective assistance have arguable merit, trial counsel has not had an opportunity to explain his conduct. It is, therefore, necessary that we remand this case for an evidentiary hearing.

> When an arguable claim of ineffective assistance of counsel has been made, and there has been no evidentiary hearing in the [trial court] to permit the defendant to develop evidence on the record to support the claim, and to provide the Commonwealth an opportunity to rebut the claim, this Court will remand for such a hearing. See: *Commonwealth v. Spotts,* 341 Pa.Super. 31, 33, 491 A.2d 132, 134 (1985).

*Commonwealth v. Petras,* 368 Pa.Super. 372, 377, 534 A.2d 483, 485 (1987). See also: *Commonwealth v. McBride,* 391 Pa.Super. 113, 121, 570 A.2d 539, 543 (1990); *Commonwealth v. Copeland,* 381 Pa.Super. 382, 397, 554 A.2d 54, 61 (1988). Upon remand, it must be determined whether trial counsel had a reasonable basis for not objecting to the testimony of the Commonwealth's expert witness and for not requesting a jury instruction on the statute of limitations. If counsel had no reasonable basis for his handling of these matters, appellant must be granted a new trial. If, however, it is determined that counsel had a reasonable

basis for his actions, then the judgment of sentence may be reimposed.

The judgment of sentence is vacated, at least for the time being, and the case is remanded for an evidentiary hearing on appellant's claims of ineffective assistance of trial counsel. If counsel is found to have been ineffective and appellant was prejudiced thereby, a new trial must be granted. If counsel is determined to have acted reasonably, however, sentence may be reimposed. In the meantime, jurisdiction is not retained.

POPOVICH, J., files a concurring and dissenting opinion.

BECK, J., files a dissenting opinion.

POPOVICH, Judge, concurring and dissenting:

I respectfully dissent from Judge Donald E. Wieand's opinion because I am convinced the verdict was against the weight of the evidence and the trial court abused its discretion in not awarding a new trial to appellant. However, I concur with Judge Wieand in all other respects.

As correctly stated by Judge Wieand, "The determination whether to grant a new trial on the ground that the verdict is against the weight of the evidence rests within the discretion of the trial court, and we will not disturb that decision absent an abuse of discretion." *Commonwealth v. Hunter*, 381 Pa.Super. 606, 617, 554 A.2d 550, 555 (1989). "A trial court should award a new trial on the ground that the verdict is against the weight of the evidence only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." *Commonwealth v. Whitney*, 511 Pa. 232, 239, 512 A.2d 1152, 1155–1156 (1986)." Majority Opinion, p. 348 of 403 Pa.Super., p. 220 of 589 A.2d.

After a thorough review of the record, I am convinced that the verdict is so contrary to the evidence as to shock one's sense of justice. Mr. Purcell was acquitted of rape, statutory rape, involuntary deviate sexual intercourse and

incest. Clearly, the jury determined that the evidence was insufficient to find Mr. Purcell had sexual intercourse with his daughter. Thus, the jury found the testimony of Barbara Purcell lacked credibility in regard to her most important allegation. I must question then how could the jury thereafter believe any of Barbara Purcell's testimony, especially in light of the defense's evidence.[1]

Mr. Purcell was convicted of indecent assault and corruption of a minor by a jury which had been hopelessly deadlocked.[2] However, the record is void of any evidence which corroborates the victim's story with the sole *exception* of the testimony of Michelle Keller, a *friend* of the victim, who stated that, on one occasion approximately six years before Barbara Purcell reported the abuse to her teacher, the victim told Michelle that Mr. Purcell "fondled" her. At the time of this conversation, Michelle was approximately 9 to 11 years old and Barbara was approximately 11 to 13 years old. N.T., p. 235.

Juxtapose Barbara's and Michelle's testimony, against the wealth of evidence in Mr. Purcell's favor. Although Barbara alleged her father had sexually abused her over a period of six and one-half years, she was only able to outline two events—the first and the last episode of alleged abuse—with any degree of specificity. The victim's mother and brother testified that they had *never* witnessed anything which would lead them to have suspected that Mr. Purcell was physically or sexually abusing his daughter. This is remarkable considering the victim alleged Mr. Purcell sexually abused her since she was eleven years old and on an average of three or four times per week from age fifteen to age seventeen and one-half. N.T., pp. 74, 101.

---

1. Instantly, the record is void of any evidence which corroborates the victim's story with the exception of the testimony of Michelle Keller, a *friend* of the victim, who stated that, on one occasion approximately six years before Barbara Purcell reported the abuse to her teacher, the victim told Michelle that Mr. Purcell fondled her.

2. The jury sent the following note to the trial judge, "Your Honor, after extensive deliberations we are unable to reach a decision. The jury is evenly divided and has shown no tendency to change their respective views since we began our deliberations."

Also, the accused vehemently denied the allegation of abuse.

The testimony of Barbara Purcell and John Purcell concerning their relationship is also enlightening. Over a period of almost two years, John and Barbara were romantically involved. During that time, Barbara wrote John an average of five "love letters" a week. N.T., pp. 119, 134. Therein, Barbara intimately discussed subjects running the entire gamut of her life, ranging from school to her sexual experience to her parents' marital problems. In fact, Barbara outlined her first sexual experience in the letters: "... It *hurt* so bad the first time and it was such a mess because I bled pretty bad. After that night I swore I would never let another guy touch me. Shortly after that the guy broke-up with me and I felt horrible. At first I though that I did something wrong and then I began to think that I wasn't good enough for him...." N.T., p. 185. In her letters, she also discussed her and John's sexual relationship, writing: "... I imagine it's going to take a while because of how tight I am. Oh well, would you rather have me this way knowing that there was only one disaster for me or would you want me differently and wonder how many guys that I went through. In my opinion, I prefer the first...." N.T., p. 187. Significantly, John testified that Barbara never once even hinted that her father was sexually abusing her. It is incredible to this jurist that Barbara never confided in John, especially when one considers that she told John everything about herself, loved him passionately and planned to marry him.

When one considers the events surrounding the weekend of May 17, 1986, the injustice of the jury's verdict becomes abundantly apparent. John and Barbara attended her Senior Prom and returned home at approximately 6:00 a.m., Saturday morning, May 17, 1986. The entire Purcell family had breakfast together after which Barbara, her mother and her brother went to bed. John remained at the Purcell residence until approximately 8:00 a.m. Barbara alleges that sometime between 8:00 a.m. and 8:45 a.m., her father

entered her room and forced her to engage in sexual intercourse.[3] Later that day, John and Barbara were together, yet she did not inform him of the abuse.

On May 18, 1986, John and Barbara visited Great Adventure, an amusement park, and Barbara bought a present for her father. Later that evening, John and Barbara's sexual relations in the Purcell home were unexpectedly interrupted by Mr. Purcell. Reacting to the intimacy of his daughter and her cousin, Mr. Purcell punched John, threw him out of the house and ordered him never to return. Mr. Purcell testified that an argument with his daughter ensued and that Barbara told him if John was not allowed to return, "I'll tell 'em you raped me. Who do you think they'll believe, you or me?" N.T., p. 598. The next morning, Barbara told a teacher at school that her father was sexually abusing her. Certainly, it can not be mere coincidence that the accusation of abuse occurred immediately after Mr. Purcell forbid John and Barbara from seeing one another.

It is true that Barbara's testimony alone is sufficient to sustain the verdict. *Commonwealth v. McIlvaine*, 385 Pa.Super. 38, 560 A.2d 155 (1989). However, that is not the question we are asked to address. We must decide whether the trial court abused its discretion in deciding if the verdict was against the *weight* of the evidence, whether the verdict was so contrary to the evidence as to shock one's sense of justice. I submit the verdict is against the weight of the evidence. My review of the record leads to the conclusion that Barbara Purcell was extremely resentful of her father for two reasons: First, she resented her father because of her parent's marital difficulties for which she blamed him; and second, she resented her father because he would not permit her to be with the man she loved, her cousin, John Purcell. Thus, she fabricated this story of sexual abuse in a misplaced effort to hurt her father. Viewing the record

**3.** I note that all the family bedrooms are proximate to one another, that Barbara had at least one dog, and possible several dogs, in her room at the time of the alleged abuse, and that it is possible to hear what is happening in one bedroom from another due to their proximity.

as a whole, the verdict of the jury must shock one's sense of justice and Mr. Purcell must be permitted another opportunity for justice to prevail. Accordingly, I would grant Mr. Purcell a new trial on the charges of indecent assault and corruption of minors.

BECK, Judge, dissenting:

I agree with the majority's resolution of the first four issues. However, unlike the majority I would not remand to determine trial counsel's ineffectiveness. I conclude counsel was not ineffective in failing to object to the admission of expert testimony on characteristics common to victims of child sexual abuse and that counsel was not ineffective for failing to request a jury instruction on the statute of limitations. Since I would affirm the judgment of sentence, I dissent.

I find counsel was not ineffective in failing to object to the admission of expert testimony on the characteristics common to victims of child sexual abuse. Given the state of the case law at the time of appellant's trial (March 1987), counsel could not have foreseen the more restrictive and, in my view, unfortunate turn that cases dealing with this issue have taken in recent years. Therefore, counsel cannot be charged with ineffectiveness for failing to make an objection which, at the time it might have been raised, was likely to fail under prevailing law.

As the majority makes clear in its thorough review of the development of the law on the admissibility of expert testimony in the context of child sexual abuse prosecutions, at the time of appellant's trial the law was governed by two relevant cases, *Commonwealth v. Baldwin*, 348 Pa.Super. 368, 502 A.2d 253 (1985) and *Commonwealth v. Seese*, 512 Pa. 439, 517 A.2d 920 (1986). Every other case which the majority cites for its conclusion that "expert testimony may not be used by the Commonwealth to bolster the credibility of an alleged victim of child abuse" was decided after appellant's trial. Therefore, the question is whether in March 1987, under *Baldwin* and *Seese*, counsel would have

had grounds to object to the admissibility of the expert's testimony. In my view, there were no such grounds.

In *Baldwin*, this court held that the testimony of a qualified expert concerning the psychological dynamics of incest and the behavioral patterns of incest victims is properly before the jury where such testimony is relevant to the issues at trial. In fact, the social worker in *Baldwin*, whose testimony was found to be admissible, testified about matters strikingly similar to the disputed testimony here. In *Baldwin* the social worker was permitted to testify to "the effects of the incestuous relationship on the victim's self-esteem, the psychological forces which cause the victim to keep the incest a secret for a long time, and why victims are often unable to recall exact dates or times or describe specific incidents in detail." *Baldwin, supra,* 348 Pa.Super at 373, 502 A.2d at 255.

In the instant case, these matters made up a large part of the substance of clinical social worker Sandra Steiker's testimony as well. The testimony was introduced because defense counsel in the instant case, similar to *Baldwin*, sought to impeach the credibility of the complainant based on her failure to report the abuse for six years, the lack of definition and detail in her accounts and her seemingly conflicted relationship with her father.

Based on *Baldwin*, defense counsel would have reason to assume that Steiker's testimony was admissible assuming she was properly qualified and assuming the matters she addressed were issues at trial. At that time, the only other case which addressed the issue was *Seese*, which, although it delineated the proper limits of expert testimony in this context, did not undermine *Baldwin* and could not have alerted defense counsel to question the admissibility of this witness' testimony. *Seese* involved the testimony of a pediatrician who had treated about one hundred alleged child abuse victims over the course of the previous four years. During the course of her testimony, the witness stated that it is "very unusual" for children to lie about sexual abuse. She even went further and said that the category of chil-

dren in which the complainant fell (prepubertal children) "do not lie." She stated a presumably scientifically based opinion that these children "don't know how to lie." The Supreme Court condemned the introduction of the testimony and found that the expert had directly commented on the veracity of the one witness in the case whose credibility was most at issue. The court never cited *Baldwin,* nor did it directly or indirectly indicate that its resolution in *Seese* eroded the principles announced in *Baldwin.*

In the instant case, the expert, Sandra Steiker, never intimated an opinion regarding the credibility of the victim, Barbara Purcell, nor did she comment on the general truthfulness of members of her "class." When appellant's case was tried, the applicable law was as follows:

> The fact that the jury, if it believes the expert's testimony, may draw inferences which would tend to bolster the victim's credibility does not make the evidence inadmissible. It is a commonplace fact that the testimony of one witness may tend to corroborate another. Far from being improper, this is normal and is good trial strategy.... In other words, so long as the expert does not render an opinion on the accuracy of the victim's recitation of facts, his or her general testimony on the dynamics of sexual abuse does not prejudice the jury.

*Baldwin,* 348 Pa.Super. at 376–377, 502 A.2d at 257 (citations omitted).

Sandra Steiker's testimony fell directly within the permissible bounds of then current case law. Counsel cannot be ineffective for failing to predict changes in the law. *Commonwealth v. White,* 515 Pa. 348, 528 A.2d 596 (1987); *Commonwealth v. Williams,* 364 Pa.Super. 630, 528 A.2d 980 (1987). Counsel in the instant case attacked Ms. Steiker's testimony on every available ground and subjected the witness to extensive and challenging cross-examination. Appellant is not entitled to relief on the issue because at time of trial *Baldwin* and *Seese* controlled and counsel cannot be ineffective for failing to predict changes in the law.

Since the time of appellant's trial, this court has been called upon to interpret the reach of *Seese* in numerous cases. The majority has amply outlined the direction in which the law seemingly has gone since *Baldwin* and *Seese* were decided. I will not repeat the history of the case law here. I write instead to challenge the course these cases have taken with respect to the use of expert testimony in child sexual abuse cases and to join with others in advocating the need to allow appropriate use of expert testimony in this area. *See Commonwealth v. Garcia,* No. 1076 Philadelphia 1989, (Ford Elliott, J. dissenting), *en banc reargument granted* 8/16/90; *Commonwealth v. Dunkle,* 385 Pa.Super. 317, 332, 561 A.2d 5, 12–16 (1989) (Kelly, J. dissenting); *Commonwealth v. Emge,* 381 Pa.Super. 139, 146, 553 A.2d 74, 77–79 (1988) (Brosky, J. dissenting); *Commonwealth v. Pearsall,* 368 Pa.Super 327, 331 n. 1, 534 A.2d 106, 108–109 n. 1 (1987). *See also Commonwealth v. Gallagher,* 519 Pa. 291, 301, 547 A.2d 355, 361–362 (Papadakos, J. dissenting; Nix, C.J. joining dissent).

The consequence of the majority's view will be to disallow *any* expert testimony in intrafamily abuse cases. As a result of this regrettable approach, juries will be left uninformed on the often mystifying and seemingly irreconcilable behavior patterns known to be characteristic of victims of child sexual abuse. This restrictive and unwarranted limitation on admittedly relevant testimony will inhibit the truth determining process of the trial. It will deprive the jury of knowledge derived from a body of scientific evidence and the experience of experts which is beyond the knowledge of laypeople. Justice Papadakos predicted in his dissent in *Gallagher, supra,* that these kinds of decisions "would lead inevitably to a situation where all psychological evidence would be barred." *Id.* I find this trend particularly distressing in light of the fact that the probative nature and underlying validity of the expertise in this field has not been questioned by the appellate courts in any of its decisions. Rather the principal concern with the testimony in this and other similar cases appears to be that it invades the province of the jury and impermissibly influences its assess-

ment of the credibility of the complainant. It should be apparent that this class of expert testimony when properly limited does not invade the province of the jury any more than any other expert testimony. Expert testimony is designed to support one side of a controversy. Expert testimony practically always supports the position of the party who called the expert. Expert knowledge in all fields is based on the expert's experience and a body of scientific evidence. Expert testimony on interfamily abuse is no different. I see no reason to single out this kind of expert testimony for exclusion.

Many factors converge in cases of this nature, i.e., intrafamily sexual abuse, which make these cases particularly appropriate for the proper use of expert testimony. First, there appears to be an undisputed body of knowledge regarding the patterns of behavior particular to victims of familial sexual abuse and their families. *See Commonwealth v. Dunkle, supra,* 385 Pa.Superior Ct. at 336–338 n. 4, 561 A.2d at 14–15 n. 4 (Kelly, J. dissenting) (citing dozens of scholarly articles documenting the significant amount of research accomplished in this field); *see also State v. Middleton,* 294 Or. 427, 431 n. 3, 657 P.2d 1215, 1222 n. 3 (1983). Moreover, incest continues to be a deep and pervasive taboo in our society and is beyond the ken and experience of most jurors. Yet, the jury is asked to assess the credibility of a child whose testimony or behavior would appear bizarre or inexplicable when judged by traditional credibility barometers. Depriving the jury of the expert's knowledge and understanding of the psychological causes and manifestations which can be observed in these child victims, leaves the jury without guideposts in an area where their cumulative common sense and experience is likely to be of little use.

The instant case demonstrates the urgency for expert testimony in the truth determining process in incest and child sexual abuse cases. Here, the victim, Barbara Purcell, kept silent about the abuse for over six years. During that period of time, she maintained a superficially "normal" relationship with her father, even seeking out his company and approval. The incestuous relationship continued under

the same roof as the rest of her family and yet they, particularly the mother, remained ostensibly unaware of it. The child's testimony was, at times, imprecise on details and time-frame. The expert's testimony provided a context in which the jury could, with any hope of accuracy, assess the credibility of the child. Fairness alone would dictate the admissibility of the expert's testimony. Defense counsel, through his cross-examination of the victim, sought to convince the jury that since the complainant did not report the abuse earlier it did not occur. It is unfair to permit this suggestion to go unrebutted when there is a recognized phenomenon among qualified professionals which can explain the behavior.[1] Obviously, the jury remains free to decide whether *this* complainant's behavior is thus explained or whether the abuse in fact did not occur. Contrary to the conclusion of the majority and those cases on which it relies, I believe that the jury *required* the expert testimony in order properly to evaluate the complainant. Without it, the jury lacks the knowledge to exercise its collective judgment.

I agree with Justice Roberts of the Supreme Court of Oregon who reasoned:

> While jurors may be capable of personalizing the emotions of victims of physical assault generally, and of assessing witness credibility accordingly, tensions unique to the trauma experienced by a child sexually abused by a family member have remained largely unknown to the public. As the expert's testimony demonstrates the routine indicia of witness reliability—consistency, willingness to aid the prosecution, straightforward rendition of the facts—may, for good reason, be lacking. As a result jurors may impose standards of normalcy on child victim/witnesses who consistently respond in distinctly abnormal fashion.

*State v. Middleton, supra,* 657 P.2d at 1222; *see also Wheat v. State,* 527 A.2d 269, 273 (Del.Supr.1987) ("Expos-

---

1. *See* McCord, Expert Psychological Testimony About Child *Complainants in Sexual Abuse Prosecutions: A Foray into the Admissibility of Novel Psychological Evidence,* 77 J.Crim.L. & Criminology 1, 62 (1986).

ing jurors to the unique interpersonal dynamics involved in prosecutions for intrafamily child sexual abuse can provide jurors with possible explanations for complainant actions and statements that are, to average laypeople, 'superficially bizarre'.").

The flaw in the reasoning of the cases which disallow this kind of expert testimony is that here, unlike in more conventional cases, we cannot depend only on the jury's "ordinary experience of life, their common knowledge of the natural tendencies of human nature." [2] This is so because the behavioral and psychological workings of these unique victims are outside the "ordinary experience" of most jurors. Acknowledging this does not in any way denigrate the judgment of juries. Nor does the admission of helpful, relevant expertise rob the jury of its ultimate function. On the contrary, it enhances and assists that function.

Furthermore, the fact that the expert's testimony, if accepted by the jury, tends to corroborate the Commonwealth's theory of the case and the credibility of the victim, does not mandate its exclusion. That is not the principle upon which admissibility of expert testimony is assessed. The purpose of expert testimony is to aid the fact finder in matters which are so complex or which go beyond common understanding or knowledge, that a jury requires specialized knowledge in order to make its ultimate determination. *Commonwealth v. Rounds,* 518 Pa. 204, 542 A.2d 997 (1988). The expert in the instant case no more usurped the jury's fact-finding function than does the expert in a narcotics possession case who testifies on a "drug courier profile." Likewise, the expert here no more bolstered the victim's credibility than does a medical expert who testifies that vaginal lacerations and adhesions are consistent with a complainant's version of a rape. In my view, a jury which has been properly instructed on the use it may make of relevant expert testimony has not had its function usurped nor its fact-finding province invaded.

**2.** *Commonwealth v. Emge, supra,* 381 Pa.Superior Ct. at 145, 553 A.2d at 77.

This court has never decided that all expert testimony on the psychological and behavioral patterns characteristic of incest victims and other sexually abused children is inadmissible. In fact, we have declined to so rule. *See Commonwealth v. Emge, supra,* 381 Pa.Superior Ct. at 146, 553 A.2d at 77. In my opinion, the instant case exemplifies the proper use of expert psychological testimony. Sandra Steiker was a well-qualified expert. The traits about which she testified were directly at issue, i.e., the secrecy and silence surrounding the crime, the seemingly normal relationship between a victim and a parent, and the incompleteness of a victim's memory concerning the offense.

Ms. Steiker testified in a straightforward, measured manner regarding the common traits and emotional motivations shared by incest victims. She had never interviewed the complainant in this case and she did not attempt to match her behavior or psychological portrait to that of a known class of victims. She did not express an opinion on the credibility of Barbara Purcell nor did she intimate that incest victims never lie. She simply offered the jury the benefit of her expertise, experience and knowledge of studies about incest to assist them in understanding possible alternative interpretations of the child's conduct. The jury was free to reject the testimony derived from the expert witness in whole or in part. The witness was subject to intensive cross-examination during which many of her assumptions and explanations were challenged by defense counsel.

A careful review of Steiker's testimony reveals her as an unbiased expert whose testimony presented the jury with a context in which to consider the testimony of other witnesses. I find the expert testimony wholly within permissible limits. This case illustrates the value and proper use of expert testimony in intrafamilial abuse cases.

Furthermore, I would not find trial counsel ineffective for failing to raise the statute of limitations as a bar to a conviction for offenses occurring prior to 1983. The abuse in the instant case occurred continuously, repeatedly and

frequently throughout the victim's adolescence. The victim testified that the first incident of sexual touching occured around the time she was eleven years old. She further testified that sexual intercourse became regular and frequent about the time she was thirteen or fourteen years old. She did not refer to any one incident by date, except the final act of intercourse which took place on the weekend of May 17–18, 1986, a date clearly within the limitations period. The prosecution here was not based upon isolated, indeed even identifiable, discrete acts of abuse by appellant. Instead, it was based on appellant's continuous course of conduct. Appellant did not defend himself in the instant case by arguing that certain acts of which he was accused occurred outside the limitations period. The factual issue in dispute here, and the one which the jury was charged to resolve, was *whether* the incidents of abuse occurred, not *when*. Appellant's defense was that he never touched his daughter at all, indeed that he was never alone with her long enough for the sexual abuse to have happened. Contrary to the majority's conclusion that it is "possible that appellant's convictions were based upon conduct outside the limitations period," I believe such a conclusion is impossible in the context of this case. The majority's conclusion flies in the face of logic and ignores the nature of the evidence in this case. I believe it would have been irrational for defense counsel to have interposed a statute of limitations defense thereby raising to the jury an issue which was not a part of his defense.

This court's decision in *Commonwealth v. Groff,* 378 Pa.Super. 353, 548 A.2d 1237 (1988) stands in stark contrast to the instant case. In *Groff,* a genuine issue of fact was presented concerning when the disputed act of intercourse occurred. Moreover, there defense counsel attempted to raise a substantial doubt in the jurors' minds about whether the crime committed occured within the statutory period. In *Groff,* the date when the offense occurred was contested by the parties and was a major element of defense strategy. Therefore, in *Groff* we found that counsel was ineffective for failing properly to preserve the statute of limitations

issue. In contrast, the trial in this case involved no such issue. In fact, it may well have undermined appellant's strategy of total and resolute denial to have argued to the jury that since a period of time about which the victim testified fell outside the statute, appellant could not be convicted of those acts even if the jury found that he had committed them.

It is beyond dispute that appellant cannot prevail on a claim of ineffectiveness of counsel unless this court can conclude that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different. *Commonwealth v. Pierce*, 515 Pa. 153, 161–62, 527 A.2d 973, 976–77 (1987). Under the circumstances of this case, the nature of the evidence and the matters in dispute, I am convinced beyond all doubt that the jury's verdict would have been no different had a statute of limitations question been before it.

Accordingly, I would affirm the judgment of sentence.